J-A10019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.J.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3691 EDA 2018 |

Appeal from the Order Entered November 9, 2018
In the Court of Common Pleas of Bucks County
Orphans' Court at No(s): 2017-A9012

BEFORE:  GANTMAN, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED JULY 11, 2019**

K.C. ("Father") appeals from the decree entered on November 9, 2018, in the Court of Common Pleas of Bucks County, involuntarily terminating his parental rights to his son, K.J.C. ("Child"), born in December of 2013.  Upon careful review, we affirm.

We summarize the relevant facts and procedural history, as follows. Child was born prematurely with opiates, cocaine, and methadone in his system.  Trial Court Opinion, 11/9/18, at 2.  Like Child's mother, D.K. ("Mother"), Father has used illegal drugs, demonstrated in the record by a lengthy criminal history involving drugs, as well as burglary, and retail theft, stemming from the year 2000.  *Id.* at 16, n. 12.

On January 9, 2014, Father and Mother agreed to a safety plan developed by Bucks County Children and Youth Social Services Agency

("Agency") requiring that, while caring for Child, they be supervised. *Id.* at 4, 12. The hospital discharged Child on January 18, 2014, and he went to the home of S.G., his paternal step-aunt ("step-aunt"). *Id.* at 3-4. On January 20, 2014, the court placed Child in emergency shelter care of the Agency after learning that step-aunt was using heroin. *Id.* at 14-15. The court adjudicated Child dependent on February 19, 2014. *Id.* at 4. Child's permanency goal was reunification. *Id.*

On February 25, 2014, when Child was nearly two months old, Father was incarcerated for crimes that involved smuggling drugs into the Bucks County Correctional Facility while incarcerated in that facility in September of 2013. N.T., 8/18/17, at 101-102; Trial Court Opinion, 11/9/18, at 16. Father was sentenced to a term of incarceration for a minimum of four years and a maximum of ten years, which he began serving at State Correctional Institution ("SCI") Graterford in September of 2015.[1] Trial Court Opinion, 11/9/18, at 16, n. 12. His minimum release date is September 2, 2019, and his maximum release date is September 2, 2025. *Id.* at 3.

In June of 2014, supervised biweekly visits commenced between Father and then approximately six-month-old Child at SCI Graterford. N.T., 6/8/17, at 54. In September of 2015, when Father began serving his most recent

---

[1] Between February 25, 2014, and September of 2015, Father served back time at SCI Graterford for crimes involving burglary and theft. Trial Court Opinion, 11/9/18, at 16, n. 12.

term of incarceration, the court granted the Agency's request to change Child's permanency goal to adoption. N.T., 7/31/17, at 123-124. Nevertheless, Father's supervised visits with Child increased to weekly on a date unspecified in the record, which continued for approximately one year, and Father "was appropriate" during them. *Id.* at 60-61. As best we can discern, Father's visits decreased to biweekly in February or March of 2017. N.T., 8/18/17, at 35.

The Agency had placed Child in "a couple of" foster homes prior to February 14, 2017, when it placed him in kinship care with his maternal cousin, and her/his husband/wife, who are a pre-adoptive resource. N.T., 7/31/17, at 81, 83, 94. At the time of the involuntary termination proceeding, Child was receiving services for developmental delays and for emotional and behavioral issues. *Id.* at 83-84, 88-92.

On February 15, 2017, the Agency filed petitions for the involuntary termination of Father's and Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The evidentiary hearing occurred on June 8, 2017, July 31, 2017, and August 18, 2017, during which legal counsel and a guardian *ad litem* represented Child, who was then four years old. The Agency presented the testimony of its caseworkers, Melanie Messinger and Debbie Selby, and a visitation caseworker from Bethanna foster care agency, Mary Dominguez, who facilitated and supervised visits between Father and Child beginning in March of 2017.

Father testified on his own behalf *via* videoconferencing from SCI Graterford, and presented the testimony of prison employees, Jason Rucker, Michael Inman, and Fred Avila, all of whom observed Child in prison visiting Father. In addition, Father presented the testimony of Jamie Rose, a foster care coordinator, who supervised his visits with Child beginning in June of 2014.

By decree dated March 22, 2018, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5), (8), and (b), and Father appealed.[2] While Father's appeal was pending, the orphans' court requested that we remand the case. The court explained that it was concerned the Agency failed to prove Child was removed from the care of Father by the court or under a voluntary agreement with an agency as required by Section 2511(a)(5) and (8). The court stated, "A remand of this matter would enable [the c]ourt to vacate our Decree of March 22, 2018 and issue a new Decree, properly addressing the underlying matter." Letter Request from Trial Court, 5/9/18 (filed at 1295 EDA 2018). Because no party objected to the court's request, we remanded the case and relinquished jurisdiction. **See In the Interest of K.J.C.**, 1295 EDA 2018 (Pa. Super. 2018).

---

[2] Mother voluntarily relinquished her parental rights to Child during the hearing on July 31, 2017. The orphans' court terminated her parental rights by decree on March 22, 2018, and she did not appeal.

- 4 -

On remand, the orphans' court, following a conference with the parties' counsel, held an evidentiary hearing with respect to whether Child was removed from the care of Father by the court pursuant to Section 2511(a)(5) and (8), which occurred on August 10, 2018, and September 24, 2018 ("post-remand hearing"). The Agency presented the testimony of its supervisor, Sara Risi. In addition, the Agency's solicitor, Brad Jackman, Esquire, testified with respect to the trial court verbally granting his request to place Child in emergency shelter care with the Agency on January 20, 2014. Father testified on his own behalf *via* videoconferencing from SCI Graterford.

The court issued the subject decree on November 9, 2018, re-affirming the termination of Father's parental rights pursuant to Section 2511(a)(5), (8), and (b). Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on January 8, 2019.

On appeal, Father presents the following issues for our review:

1. Whether the [orphans'] court abused its discretion and/or erred as a matter of law and fact by involuntarily terminating Father's parental rights and duties under 23 Pa.C.S. § 2511(a)(5), (8), and (b) and specifically:

> a. Whether the [orphans'] court abused its discretion and/or erred as a matter of law and fact by involuntarily terminating Father's parental rights and duties under 23 Pa.C.S. § 2511(a)(5) when the Agency failed to prove by clear and convincing evidence that "the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy

those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child[?]" 23 Pa.C.S. § 2511(a)(5).

b. Whether the [orphans'] court abused its discretion and/or erred as a matter of law and fact by involuntarily terminating Father's parental rights and duties under 23 Pa.C.S. § 2511(a)(8) when the Agency failed to prove by clear and convincing evidence that "the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child[?]" 23 Pa.C.S. § 2511(a)(8).

c. Whether the [orphans'] court abused its discretion and/or erred as a matter of law and fact by involuntarily terminating Father's parental rights and duties when determining that there was not clear and convincing evidence that it was in the best interest of the child to terminate Father's rights when giving primary consideration to the child's developmental, physical and emotional needs and welfare pursuant to 23 Pa.C.S. § 2511(b) especially when there is an undeniable bond between Father and Child[?]

2. Whether on August 10, 2018 and September 24, 2018, the [orphans'] court erred as a matter of law, abused its discretion and violated Father's due process rights by reopening the record and proceeding with post-trial proceedings and/or post-trial motions/exceptions, in violation of Pennsylvania Orphans' Court Rules 8.1 and 8.2, in order to afford the Agency an opportunity to prove its case under 23 Pa.C.S. § 2511(a)(5), (8) when the [orphans'] court previously stated that the Agency did not prove its case under 23 Pa.C.S. § 2511(a)(5), (8)[?]

3. Whether the [orphans'] court erred as a matter of law and abused its discretion in the following circumstances:

a. Whether the [orphans'] court erred as a matter of law and abused its discretion by allowing Sara Risi to testify to whether there were any records indicating whether the subject

- 6 -

child was in the custody of anyone other than the child's parents from the child's date of birth through January 20, 2014 when there were document(s) on this matter and such testimony is hearsay and in violation of the best evidence rule[?] The aforementioned testimony and [objection are] located on page 29 of the August 10, 2018 transcript.

b. Whether the [orphans'] court erred as a matter of law and abused its discretion by allowing Sara Risi to testify to and to admit Exhibit CY-1 (from the reopened hearing) when said Exhibit was not within the personal knowledge of Sara Risi in relation to the creation and signing of said Exhibit[?] The aforementioned testimony can be found on pages 31 through 34 of the August 10, 2018 transcript.

c. Whether the [orphans'] court erred as a matter of law and abused its discretion by allowing Sara Risi to testify to the length of time that the subject child stayed in [step-aunt]'s home when such testimony is hearsay and not within the personal knowledge of Sara Risi[?] The aforementioned testimony can be found at pages 35 through 36 of the August 10, 2018 transcript.

4. Whether the [orphans'] court erred as a matter of law and abused its discretion by admitting CY-4 (from the reopened hearing) in violation of the law and Father's due process rights as said exhibit was obtained through ex-parte communications[?]

Father's brief at 8-11.

We review this appeal according to an abuse of discretion standard, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(5), (8), and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time

and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(5), (8), (b).

The threshold requirement in the termination of parental rights under Section 2511(a)(5) and (8) is that "the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency." 23 Pa.C.S. § 2511(a)(5), (8). In **In re C.S.**, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*), this Court held that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights because the child was not removed from his care, but from the mother's care. At the time of the child's removal in that case, the father was incarcerated, and the child had never

been in his care. Similarly, in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010), this Court held that Section 2511(a)(5) and (8) were inapplicable because the father was incarcerated at the time the child was removed, and the child had never been in his care.

To affirm the subject decree, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We agree that termination was proper under Section 2511(a)(8). Therefore, we do not consider Father's claims with respect to Section 2511(a)(5).

This Court has explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the child welfare agency supplied over a realistic time period. *See id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement

or the availability or efficacy of the agency's services. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

The court must also consider whether termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of M.E.P.*, *supra* at 1275-1276. The "needs and welfare" analysis is relevant to both Sections 2511(a)(8) and (b). In *In re Adoption of C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), this Court stated,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 1009 (citations omitted).

Further, in *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), our Supreme Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied."[3] We conclude that the rationale of the *S.P.* Court is applicable

_____

[3] Section 2511(a)(2) provides:

in this case under Section 2511(a)(8) where Father is serving a lengthy prison sentence.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

---

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

23 Pa.C.S. § 2511(a)(2).

Turning to the merits of this appeal, the majority of Father's issues question whether the court removed Child from his care pursuant to Section 2511(a)(5) and (8). Father argues that Child was removed from step-aunt's care, not from his care. Father argues in his second issue that it was error for the orphans' court to re-open the evidentiary record on remand to decide this question. Specifically, he claims that the court violated Pennsylvania Orphans' Court Rule 8.2, which provides, "Motions for reconsideration are not permitted to any order in involuntary termination or adoption matters under the Adoption Act, 23 Pa.C.S. § 2101 *et seq*." He argues, "if post-trial motions cannot be filed or heard in involuntary termination matters, post-trial hearings cannot occur either." Father's brief at 45. Father asserts alternatively in his third and fourth issues that the court abused its discretion by permitting incompetent and inadmissible hearsay testimony and documentary evidence during the post-remand hearing, discussed *infra*.

We begin by reviewing the undisputed evidence from the original hearing regarding whether Child was removed from Father's care by the court. Father testified that he was present in the hospital when Child was born. N.T., 8/18/17, at 101. The hospital discharged Child on January 18, 2014, and he went to the home of step-aunt, a family resource, pursuant to a safety plan, that required Father and Mother be supervised in the presence of Child. Trial Court Opinion, 3/22/18, at 2. The court found that step-aunt "began drug treatment herself a few days later, and [Child] was brought into the care of

the Agency pursuant to an Emergency Shelter Care Order." *Id.* at 2-3. When Child was nearly two months old, on February 25, 2014, Father was incarcerated. N.T., 8/18/17, at 101-102.

At the post-remand hearing, Ms. Risi, the Agency supervisor for this family since August of 2017, testified:

> A safety plan is essentially a safeguard for a child when a safety threat has been identified by the Agency that is intended to prevent a child's placement or removal from the care and custody of their parent. Essentially a responsible person is identified to supervise the parents as they care for that child . . . until the safety threat is removed.

N.T., 8/10/18, at 30. She testified that the safety plan in this case is dated January 9, 2014, and Father's and Mother's signatures are reflected on the line designated for parent or legal guardian. Trial Court Opinion, 11/9/18, at 12 (citing N.T., 8/10/18, at 32-34). The safety plan did not give legal custody to step-aunt or to anyone else. *Id.* at 13 (citing N.T., 9/24/18, at 48). Thus, when Child went to step-aunt's home, he was not in the Agency's custody. N.T., 8/10/18, at 35. The safety plan did not restrict Father from being at step-aunt's home, but required supervision of Father while in the company of Child. Trial Court Opinion, 11/9/18, at 13 (citing N.T., 9/24/18, at 45, 50, 66, 75-77).

Both Ms. Risi and Father testified at the post-remand hearing that Father stayed overnight at step-aunt's home to care for Child on January 18, 2014, and he remained in the home during the day on January 19, 2014. *Id.* Father testified that he fed Child and changed his diapers during that time-period.

Father did not sleep overnight at step-aunt's home on January 19, 2014, but he returned to her home on the morning of January 20, 2014. *Id.* (citing N.T., 9/24/18, at 50, 66-68, 77). Ms. Risi testified that Child remained in step-aunt's home only until January 20, 2014. N.T., 8/10/18, at 36.

Attorney Jackman, the Agency's solicitor, testified at the post-remand hearing that he contacted the trial court by telephone on January 20, 2014, and requested an emergency protective custody order,[4] due to the Agency learning that step-aunt was using heroin. Trial Court Opinion, 11/9/18, at 14-15 (citing N.T., 9/24/18, at 10-12, 39). The court granted his request, and Child came into the care of the Agency on January 20, 2014. *Id.* at 15 (N.T., 8/10/18, at 36).

The orphans' court concluded that the evidence presented at both the original and post-remand hearings demonstrate that Child was in Father's care from the time of birth until removed by the trial court and placed in emergency shelter care on January 20, 2014. We agree. Therefore, we reject Father's claim that Child was not removed from his care.

We next review whether the court erred by re-opening the record on remand. This Court remanded the case in Father's prior appeal upon the request of the orphans' court to properly address the threshold requirement

---

[4] We observe that Attorney Jackman and the orphans' court used the terms "emergency protective custody" and "emergency shelter care" interchangeably.

of Section 2511(a)(5) and (8). The court determined on remand that the Agency inadvertently failed to provide sufficient detail regarding whether Child was removed from Father's care. Trial Court Opinion, 11/9/18, at 12. The court desired "a more complete fact record of all of the relevant circumstances. No unfair disadvantage was created for any of the parties." **Id.** (citations omitted) (citing **In re J.E.F.**, 409 A.2d 1165 (Pa. 1979) (holding that the trial court erred in denying the agency's request to reopen its case and introduce records into evidence)). Both Father and the Agency presented testimony at the post-remand hearing. We discern no error. Indeed, the court did not entertain a motion for reconsideration under the Orphans' Court Rules. Thus, those rules are inapplicable in this case. Father's second issue fails.

In his third issue, Father asserts that the court abused its discretion by permitting incompetent and inadmissible hearsay testimony at the post-remand hearing by Ms. Risi, the Agency supervisor since August of 2017. Specifically, he asserts that testimony was inadmissible hearsay with respect to Exhibit CY-1, the safety plan executed by Father and Mother on January 9, 2014.[5] In addition, Father asserts that Ms. Risi's testimony regarding how long Child remained with step-aunt was inadmissible hearsay. We disagree.

Our Supreme Court has explained:

---

[5] Exhibit CY-1 is not included in the certified record before this Court.

[T]he decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. A reviewing court will not disturb these rulings absent an abuse of discretion. Discretion is abused if, *inter alia*, the orphans' court overrides or misapplies the law.

"Hearsay" is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Under the Pennsylvania Rules of Evidence, hearsay evidence is incompetent and inadmissible unless it meets an exception set forth in the Rules or one prescribed by this Court or statute. Pa.R.E. 802. One such exception to the prohibition against hearsay, at issue in this case, is commonly known as the business records exception, which permits the admission of:

A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). **See also** 42 Pa.C.S. § 6108(b) ("A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its

- 17 -

identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.").

*In re A.J.R.-H.*, 188 A.3d 1157, 1166-1167 (Pa. 2018) (citations omitted);

*see also Freed v. Geisinger Medical Center*, 910 A.2d 68, 72 (Pa. Super. 2006) ("[T]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.").

In its Rule 1925(a) opinion, the orphans' court explained its evidentiary ruling, as follows.

> Ms. Risi's testimony regarding the relevant time period in January 2014, when . . . Child came into the custody of the Agency, upon being removed from the care of Father, was properly admitted. As a qualified witness, given her capacity as an Agency supervisor, Ms. Risi offered testimony and identified relevant information based upon documents established and maintained in the ordinary course of Agency business. (N.T., 8/10/18, [at] 24-28).[2] Her testimony encompassed the Agency's practice of maintaining certain records, the individuals involved in the preparation and execution of certain documents, as well as the contemporaneous timing as to which certain information was recorded and/or documents were formalized. (N.T., 8/10/18, [at] 27-32). No testimony or evidence was presented which indicated any lack of trustworthiness regarding the sources of Ms. Risi's testimony. Importantly, Father's own testimony regarding the circumstances surrounding the care of Child at the time the Agency secured the permission of the [trial c]ourt to remove him from Father's care, generally correlated with that of Ms. Risi.[3] The business records exception was properly applied under those circumstances, and Ms. Risi's testimony was properly admitted into evidence.

_____

[2] Ms. Risi testified that based upon her review of Agency records regarding the subject child, there was no indication that he was in the custody of anyone other than his biological parents as of the time he was [c]ourt-ordered into

the custody of the Agency on January 20, 2014. (N.T., 8/10/18, [at] 29-30).

[3] Accordingly, even assuming *arguendo* that it was error to allow the challenged testimony of Ms. Risi, such error was harmless, since Ms. Risi's testimony was merely cumulative of other untainted evidence which was substantially similar to the allegedly erroneously admitted evidence. . . .

_____

Trial Court Opinion, 1/8/19, at 6-7 (some citations and footnotes omitted).

Based upon our careful review of the testimony of Ms. Risi and Father, the business records exception to the prohibition against hearsay, and the rationale of the orphans' court, we discern no abuse of discretion by the court in permitting Ms. Risi to testify regarding Exhibit CY-1 and to the length of time that Child then remained with step-aunt. Father's third issue fails.

In his fourth issue, Father asserts that the court abused its discretion by admitting into evidence Exhibit CY-4, a certified copy of an order for emergency protective custody, which was identified by the Agency's solicitor, Attorney Jackman, who also represented the Agency in the subject proceedings. We are likewise unpersuaded by this argument.

By way of background, on the first day of the post-remand hearing, Father's counsel objected to Exhibit CY-2, which was an *uncertified* copy of the order for emergency protective custody, one that did not include the trial court's signature. N.T., 8/10/18, at 41. On inquiry by the orphans' court, Attorney Jackman stated that the document was not stamped by the court with the date or time of filing. *Id.* at 42. As such, the orphans' court sustained

- 19 -

the objection of Father's counsel. *Id.* The court continued the additional hearing for Attorney Jackman to certify the order or prepare to testify himself regarding his first-hand knowledge of the emergency order. *Id.* at 44-45.

On the second and final day of the post-remand hearing, Attorney Jackman marked as Exhibit CY-4 a certified copy of the emergency order signed by the Honorable Robert O. Baldi of the Court of Common Pleas of Bucks County. Attorney Jackman testified that, on the evening of January 20, 2014, he contacted Judge Baldi by telephone to explain the facts contained in an application for emergency custody of Child. N.T., 9/24/18, at 11. Attorney Jackman stated that Judge Baldi issued the emergency protective order verbally on that date. *Id.* Attorney Jackman explained, "Back at that time, the protocols for the [c]ourt was not to necessarily acquire the judge's actual signature on the emergency protective custody order; therefore, one was never obtained. . . ." *Id.* The orphans' court aptly summarized his remaining testimony, as follows.

> [Attorney] Jackman also testified to discussing this issue more recently with Judge Baldi, on approximately August 14, 2018. As a result of their conversation and the various proofs and confirmations which [Attorney] Jackman provided to Judge Baldi, Judge Baldi wrote his name on the [emergency protective custody] [o]rder. . . . (N.T., 9/24/2018, [at] 12-15). The Clerk of Courts office then provided a certified copy of that Order. The order had previously been admitted into evidence as Exhibit CY-2, and now, with Judge Baldi's name included, was admitted into evidence as Exhibit CY-4. (N.T., 9/24/2018, [at] 12-15).[11]

---

[11] Exhibit CY-4 was admitted into evidence over the objection of Father's counsel, who voiced objection to what

> he referred to as [Attorney] Jackman's "ex parte" communication with Judge Baldi in procuring a signature many years after the fact. (N.T., 9/24/18, [at] 7, 8, 16, 25-26). In accepting this Exhibit into evidence, we explained that the purpose of the hearing was to determine whether Child was removed by the [c]ourt from the care of the parent. Accordingly, the addition of Judge Baldi's signature at this time was, in fact, irrelevant to this [c]ourt's determinations pursuant to [Section] § [2511](a)(5) and (a)(8). (N.T., 9/24/18, [at] 17).
>
> _____

Trial Court Opinion, 11/9/18, at 14.

We need not conclude whether Exhibit CY-4 was inadmissible hearsay evidence insofar as Exhibit CY-4 was cumulative to the testimony by Attorney Jackman that Judge Baldi verbally granted his request to place Child in the Agency's emergency protective custody on January 20, 2014. As such, there was no harm or prejudice to Father by the court admitting Exhibit CY-4 into evidence. We conclude that the court's evidentiary ruling did not constitute reversible error. *See Freed v. Geisinger Medical Center*, 910 A.2d at 72. Father's fourth issue fails.

We now review the decree pursuant to the remaining elements of Section 2511(a)(8). Father argues that the conditions which led to Child's removal or placement do not continue to exist because he was *not* incarcerated at that time. If the reason for Child's removal is Father's drug use, then Father claims that he maintained sobriety during the entirety of Child's life, as well as participated in and led drug and alcohol classes in prison. In addition, Father argues that terminating his parental rights does not best

serve Child's needs and welfare because a strong bond exists between him and Child.

Child has been removed from Father's care since January of 2014, far in excess of the 12-month statutory requisite under Section 2511(a)(8). Although Father was not incarcerated at the time of Child's removal from his care, there is no dispute in the record that he was incapable of providing for Child's needs and welfare. At the time of the original hearing in 2017, reunification of Father and Child was not imminent because Father remained incapable of providing for Child's needs and welfare due to his incarceration, which included a minimum sentence date of September of 2019. Therefore, it was unnecessary for the orphans' court to evaluate Father's current willingness to perform his parental duties if and when he was paroled or completed his sentence. *See In re Adoption of M.E.P.*, 825 A.2d at 1276 (explaining that termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement); *see also In re Adoption of S.P.*, 47 A.3d at 828.

With respect to whether terminating Father's parental rights best serves Child's needs and welfare pursuant to Section 2511(a)(8), the court acknowledged that a bond exists between Father and Child. The court stated, "We heard from visitation caseworkers as well as, rather remarkably, from various prison staff, all of whom have had occasion to observe Child's happy

demeanor during his visits with Father, along with Father's unwavering efforts to establish and maintain a dedicated and loving connection with Child." Trial Court Opinion, 3/22/18, at 13. Nevertheless, the court found that Child's need for stability outweighs his bond with Father. The court explained, "Child has had multiple foster care placements[,] and the fact that he has suffered from various developmental delays speak to his particular need for stability." *Id.* at 15, n. 6. Further, the court found,

> the unfortunate reality here is that Child has been in foster care for over four (4) years, and would remain in foster care for a minimum of an additional eighteen (18) months before Father can conceivably be released from prison upon reaching his minimum date. Within the constraints of being incarcerated, Father's efforts to establish a role in Child's life and during visits have been significant. However, such efforts while incarcerated by no means guarantees an ability to be an adequate, full[-]time parent once Father is released to the community.

*Id.* at 14. The testimonial evidence supports the court's findings, and its conclusion is reasonable that terminating Father's parental rights would best serve Child's needs and welfare, particularly his need for stability. Therefore, we discern no abuse of discretion by the orphans' court with respect to Section 2511(a)(8).

As stated above, once the court determines that a parent's conduct warrants termination under Section 2511(a), it must give primary consideration under Section 2511(b) to a child's developmental, physical, and emotional needs and welfare.

Our case law is well-settled and states as follows:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In considering the affection which a child may have for his or her natural parents, this Court has stated:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in

- 24 -

terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d at 535 (internal citations and quotation marks omitted).

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

As discussed above, the court found in this case that Child has a particular need for stability due to his multiple foster care placements and his developmental delays. The court further found that Father would not be able to provide Child with stability on any certain date. The court concluded, "Father's inability to adequately parent Child for the foreseeable future yields the inescapable conclusion that the termination of parental rights is in Child's best interests. Father's own conduct has adversely impacted his ability to provide stability for Child." Trial Court Opinion, 3/22/18, at 14. The testimonial evidence supports these findings.

In addition, the court aptly stated, "As a matter of law and of sound public policy, the existence of a bond or attachment of a child to a parent should not inevitably result in the denial of the termination petition, as it is only one of many factors." *Id.*; *see also In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008) (stating, "no bond worth preserving is formed between a child and natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated.").

Further, the court recognized that Child is thriving in his kinship care home, a pre-adoptive placement, where he has resided since February 14, 2017, one day prior to the Agency filing the termination petition. Melanie Messinger, the Agency caseworker from April of 2014, until approximately May of 2017, who visited Child in the kinship care home on five occasions, at minimum, testified that Child and his kinship parents have "[a] mutually affectionate relationship. [Child] appears content and secure, comfortable in his surroundings. He moves around and accesses different parts of the house, acts as if it's his home. He . . . interacts very easily with [his kinship parents]. It's a positive interaction." N.T., 7/31/17, at 85-86; *see also id.* at 125-126. Moreover, she observed:

> I think [Child is] surrounded in stability. He has a routine. He's got a very loving, affectionate environment that he is being raised in. His . . . basic needs are being met, and then some.
>
> I mean emotionally, the [kinship] parents are seeking what's best for him and [en]suring that . . . he's developmentally on target. If he's not, that they're seeking out appropriate supports to put services in place so that he is.

> I think . . . they recognize what his struggles are and continue to reiterate that that doesn't dissuade them from their commitment to him.

*Id.* at 125.

Likewise, the current Agency caseworker, Debbie Selby, who visited Child in the kinship home on two occasions, testified with respect to the interaction between Child and his kinship parents, as follows.

> The interaction is very loving.  It's very easy.  [Child] . . . has looked to [his kinship mother] to have his needs met. He's very affectionate with her.
>
> When I've been at the foster home, he's had conversations with [his kinship mother] about, "Mommy, look at this show," or "Mommy, can I have this, that?"
>
> [Child] . . . was excited to show me his bedroom there.  So the interactions that I've observed have been very positive.

*Id.* at 134.  Based on the foregoing testimonial evidence as applied to the relevant law, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(b).  Accordingly, we affirm the decree.[6]

---

[6] Child's guardian *ad litem* joined in the Agency's appellee brief in support of the subject decree.  In addition, Child's legal counsel filed a letter in this Court advising that he relies upon the court's November 9, 2018 opinion accompanying the subject decree in lieu of filing a brief in support of the decree.

Decree affirmed.[7]

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/11/19

---

[7] On June 7, 2019, Father filed an application for leave to file a post-submission communication pursuant to Pa.R.A.P. 2501(a). Father's argument of his case in this Court was concluded on May 1, 2019. Father now requests permission to file in this Court a written decision regarding his parole date allegedly made by the Commonwealth of Pennsylvania Board of Probation and Parole on May 28, 2019. Because Father's parole date is not relevant to our disposition in this appeal, we deny his application.